Number 19, 3575 Sabir v. Williams. Thank you. Very good. Okay, Mr. Winnick. Good morning, Your Honor. May it please the Court, Daniel Winnick for the defendants. This case concerns a policy formerly in effect at the federal prison in Danbury. It's nearly identical to a policy in effect for decades at New York's state prisons, a policy allowing inmates to gather for group prayers at certain times and locations within the prison but not at all times or in all locations. This Court has held that prison officials were entitled to qualified immunity for applying the New York policy and neither the Supreme Court nor this Court has ever held this sort of policy to be unlawful. This is – to back up a little bit, this is on a motion to dismiss. Correct, Your Honor. It would be rather a different case perhaps if it was on a motion for summary judgment after some fact-finding or discovery and we could – I think there's a – it would be a much different case if we had the facts before us and some of the history before us. Thomas Robertson. Join the meeting. Well, Your Honor, this is – The three of us have the same question. There you go. This Court has repeatedly emphasized, Your Honor, that qualified immunity can and indeed should be resolved on a motion to dismiss where the allegations taken as true do not plausibly state a violation of clearly established law. But that wouldn't decide the ultimate issue. It would decide the motion to dismiss. So it wouldn't be dismissed and you would go on to presumably towards fact-finding and perhaps trial. I'm sorry, Your Honor. Let me say that more clearly. Qualified immunity can and should be granted on a motion to dismiss where the allegations taken as true don't plausibly establish a violation of clearly established law. And that's the case here. But the allegations here – excuse me for interrupting – but the allegations here also include the allegation that groups of prisoners were allowed to gather for recreational and other activities in numbers far exceeding what had been requested for congregate prayer. And to me that raises a significant question about what the rationale for the policy of requiring prayer limited to two persons together and that it occur in the chapel would be. Taking all of the allegations as true, as we've just said, we don't have a developed explanation for why the prison adopted the policy that it did and why it was lenient as to prisoners gathering in nonreligious circumstances. So to me that raised a question that a call for factual development such as Judge Sack is suggesting would be appropriate before a determination on qualified immunity is made, even recognizing that we're instructed to adjudicate, if we can, as early as possible in the proceedings. Why doesn't that raise a question about what the rationale was for the policy? Two or three points, Your Honor, in response to that. The first is that in Chabaz v. Coughlin, where this Court held that qualified immunity was appropriate for the application of New York's similar policy, it was also true that prisoners were allowed to use the recreation yard for card games. The second is that under this Court's decision in Red v. Wright and the unpublished decision in Paul v. Ekpe, in order to defeat a qualified immunity defense, plaintiff has to establish, has to plausibly allege that the policy in question was not the least restrictive means of advancing a compelling government interest. In other words, there have to be cases you can point to to show that a policy like this one has been held unlawful. Well, except here, I'm not sure we necessarily need a case flow. I mean, the statute says that the government shall not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, except subject to a furtherance of a compelling governmental interest. I find it difficult to look at the complaint and be certain that there was a compelling governmental interest where, on the one hand, the prison was allowing prisoners to gather in numbers substantially larger than were allowed for congregate prayer. I find it difficult to, I mean, just looking at the statutory language to know that that was, that there was a compelling governmental interest. Why isn't that enough? So, Your Honor, there might well be a challenging question here. If the claim for equitable relief were alive, in other words, if it were alive, question whether this policy actually violated RFRA. But that's not the issue here. The issue is whether the wardens can be subjected to monetary damages in their individual capacities for maintaining this policy. In order for that to be true, it has to have been clear to them that what they were doing was unlawful. And unless it's, you know, truly obvious in cases such as Pope v. Pelzer that their conduct was just beyond the pale, a plaintiff has to be able to point to a case from this Court of the Supreme Court where a similar policy was held unlawful. And not only can plaintiffs not do that here, but again, this Court has held and district courts in this circuit have held that qualified immunity was proper for the application of a nearly identical policy. It's very difficult in the face of that to say that these wardens were so beyond the reservation that they should be subjected to the risk of monetary damages. But once again, we're at a motion-to-dismiss stage where we're enjoined to take all inferences in the plaintiff's favor and to look at the plausible allegations. And it may very well be that at summary judgment the absence of a factual analog, a close factual analog, as well as legitimate reasons for imposing such a policy would be clear. But I'm not sure it is just from the complaint. Well, so two points briefly. One is that there are facts in the record. The, you know, responses to the plaintiff's grievances were attached to the complaint. So those are in the record. And the second, and I think this is the more important point, under Red v. Wright and Hall v. Acpay. I'm sorry? Under Red v. Wright and Hall v. Acpay, the plaintiffs have to be able to show that the policy was not the least restrictive means of advancing a compelling government interest. That they can do only if they can point to a case holding on that. But how do they know what the compelling governmental interest was that the policy that the prison actually relies on? What exactly it was? Just from the grievance responses? That's the record evidence of it, yes. That this was in the view of the BOP administrators who reviewed the denial of those grievances, the least restrictive means of, you know, advancing interests in security and in the management of space in the prison. And again, you know, from the perspective of the wardens here, the question is, were they reasonably unnoticed that they could not maintain a policy like this one? And you just can't have that where there are not cases saying that a policy like this one is unlawful unless that follows, you know, clear as day from, you know, as in cases like Hope v. Pelzer and Taylor v. Rioja. I see that I'm running into my rebuttal time. Your point is that I guess that if it's debatable as to whether or not there was a violation here, that under those circumstances there should be qualified immunity because it's not, wouldn't be clear, wouldn't be clear to the officers or to the wardens that their conduct was in violation. And just looking at it from a qualified immunity point, is that essentially the point that you're making? That's exactly right, Your Honor. And I guess it's not clear because, A, we don't know, maybe don't know the facts, which would counsel for it being kicked over to summer judgment, but also our law is less than pollusive in this area. Sometimes we've said just sort of knowing the parameters of the right are sufficient for the officers to be unnoticed. Others say, and I think the Supreme Court has made quite clear, that you need to have a particularity to the facts, a greater particularity to the facts. It can't be at too generalized a level. It has to be particularized to the facts in question. And your argument is that these particular facts did not let, there was no prior decision that says that on these prior facts what they did was a violation. That's right, Your Honor. RIFRA is clear, that's the law, but the Supreme Court has said over and again that it is not enough that the general standard be clearly established. But there are rules that say that if the law is such that it would lead ineluctably to the conclusion that there was a violation, and the facts support that, that the officer could be unnoticed. That's certainly true, Your Honor. That doesn't have to be exactly the same case before, but it has to be completely clear to a reasonable official in the position of a government employee that what they're doing is unlawful, and that wasn't the case here. Right. So I think the district judge here had a question in his mind about where this all was and just simply wanted to wait until the summary judgment phase before granting qualified immunity. And at that point, he'd have all the facts quite clear, and everybody would be able to make their position clearly. You can do qualified immunity. You can dismiss a case on qualified immunity grounds on the pleadings, and it's pretty straightforward. But that usually depends on questions of law, pure questions of law, not facts that leave things in doubt that haven't been determined. Your Honor, the district court didn't identify, and plaintiffs haven't identified what facts would be necessary to resolve the issue of qualified immunity. The district court, as Your Honor noted, just sort of walked away from the issue, didn't really engage the qualified immunity analysis at all. And at a minimum, if this court doesn't wish to reverse, it should vacate and remand to the district court. He didn't lay out the law and apply it directly. He just said there may be a problem here. He didn't point to any analogous case that would have put the defendants on notice. Even taking the allegations is true that what they were doing was unlawful. Yeah. And these were policies in this particular institution that were not in other institutions, but this institution had had these policies for some time. Is that correct? So they were in place at at least one other Federal prison. We know from Johnson v. Killian in the Southern District of New York, which granted qualified immunity, you know, as to the virtually identical policy there. They were in place in New York's prisons. But you're right, not at all Federal prisons. And it's been eliminated now. Isn't that right? Yes. It's been changed at Danbury. Exactly. Yes. After this case was filed? After this case was filed. Mm-hmm. At least it had that effect. So you have reserved three minutes of rebuttal, Mr. Winnick. Thank you. Thank you very much. Mr. Callahan. Good morning, Your Honors. Matthew Callahan from Muslim Advocates on behalf of plaintiffs for Peek-Somber. Could you speak a little more slowly and lift up the microphone, please? I was having difficulty hearing you. Thank you, Your Honor. Can you hear me now? Much better. Just speak a little slowly. With the mask, it slows us down a little bit. Got it. Will do. Thank you. Thank you, Your Honor. In this case, plaintiffs have alleged facts that put defendants on reasonable notice that this policy had no justification. And so what we're faced with at the motion to dismiss stage in this case is not one of the difficult line-drawing situations where qualified immunity would be appropriate and where the kind of factual harmony that defendants seek to impose on this case would be required in order to proceed past the motion to dismiss stage. What we have here is a case where there was no justification for the policy, and that can be shown by the way that religious conduct and solely religious conduct was targeted by this policy. So you're saying that qualified immunity should be flatly denied and then you should be able to proceed on to the merits? Yes, Your Honor. So that's not where the district court came out. The district court wanted to, in effect, put off the decision. There's no point in putting off the decision. There's no qualified immunity here. I'm sorry, Your Honor. We would be open to defendants renewing their motion for qualified immunity at the summary judgment stage. We believe that's their legal right. So we only argue that— But you're saying it's their legal right, but they'd lose, is that what you're saying? Well, we certainly believe that we will be able to prove up the facts in this case. Let me ask you this. What exactly was it that they were on notice of and why? Well, Your Honor, there's a longstanding right that requires prisons to affirmatively accommodate group prayer. That's true. Yes, Your Honor. That's true, but whether in a particular situation there is an accommodation or not would be an open question. And if that's an open question, if the wardens don't know whether their particular action would violate a constitutional right, it might, but they don't know that, then the fact that there's a generalized principle that you have to accommodate religious views or religion wouldn't do it. That's a too high a level of generality, isn't it? On the circumstances of where it deals with communal praying or restrictions of that sort that restrict communal prayer, and there's a case on that point where they've said, you know, a communal prayer has to be honored. It can't just be at a chapel. They ought to be able to have prayer anywhere. Would you have a case on that point to put the officers on notice? Well, Your Honor, I think that the nature of RFRA is important here. We believe that the Salahuddin v. Gourd case is an example of a place where the standard of requiring somebody to have some justification for a policy was clear enough that defendants could not, without any justification, impose this policy on religious activity. And because RFRA requires a specific tailoring to the claimant and to the policy at issue, invoking New York's separate policy for group prayer is insufficient. Doesn't our decision in Shabazz, though, suggest that this type of policy can be justifiable? Your Honor, I think it's possible to justify a policy like this, but Shabazz, let's remember, was decided on summary judgment on a full record where the defendants were able to justify it, and it was decided under a lower standard than RFRA. Nonetheless, with Shabazz on the books, why wasn't it reasonable for the prison officials to believe they were, you know, in good faith acting on a reasonable policy? Why was it clearly established it was unreasonable? Well, Your Honor, I think it's like, in this case it's the combination of RFRA's burden shifting to the government to justify the application of a policy, the individualized requirement that strict scrutiny and RFRA impose on the government to, you know, tailor a policy to the claimants themselves. And I believe that that combination really sets this apart from the other cases where the government was able to justify a restriction on group prayer. We also have here the large variety of secular activity that was led by inmates, that was unsupervised, it's a low-security facility. I think a number of the allegations in the complaint, including the fact that other federal prisons did accommodate this group prayer. In other words, there were prisons that did restrict it, but given that the prisons that these plaintiffs came from did in fact accommodate group prayer, it's unreasonable to impose this kind of very draconian restriction on group prayer. Only groups of two were permitted. A third person was a violation of the policy. So I think on those facts it was reasonably clear to a government official that they could not impose such a policy. I understood your adversary to be saying that a similar policy was in place in New York State during a period of time. Is that correct? And if so, why wouldn't that also be a basis for prison officials to believe that they were not violating criminally established law? Well, Your Honor, I can't speak to the New York State prison policy. I've seen it litigated, that policy, so I believe that certainly some New York facilities were restricting it. But again, RFRA doesn't require categorical determinations that a kind of religious restriction were reasonable. It requires that officials look at the circumstances of the prison and its operation and the claimants and the people who wanted to practice the religious exercise that they're seeking to engage in. Here, plaintiffs have alleged that the prayer was non-disruptive, it was in small groups, it was in parts of the prison where large group activities were tolerated and where the permitting group prayer would not burden the government officials. And at the motion-to-dismiss stage, those allegations should be sufficient. Taking those allegations as true and drawing all inferences in favor of the plaintiffs. In any event, wasn't Salahuddin after Ellen's summary judgment? Yes, Your Honor. There had been a factual record of that. Yes, in Salahuddin v. Gord, yes. As was Shabazz, as were many of the authorities cited by defendants. And to respond to defendants' argument that there's no facts necessary in discovery here, I'd just like to submit that we have heard on confirmed reports that the policy in this case was selectively enforced and was only enforced against certain religious groups like Muslims who engage in demonstrative prayer and not against, say, Christians who prayed at tables. I'm sorry. Is that an allegation in the complaint? It is not in the complaint, Your Honor, but it's an example of the kinds of facts that could be developed through discovery. And we believe that if we could develop the selective enforcement of the policy, that that would be probative of whether or not the policy was itself narrowly tailored and whether the defendants were reasonable in believing that the policy was justified. Why would it be unreasonable for us to accept the justifications given in the grievance responses that were attached to the complaint, security, equity, and budget concerns as the legitimate concerns that prompted the imposition of this policy? Well, Your Honor, we acknowledge that those are government interests that would qualify under RFRA, but the grievance responses show no narrow tailoring to the policy at issue here. RFRA imposes a requirement that prison officials affirmatively accommodate religious conduct, not merely put it on the same level with secular conduct, but that they go out of their way not to restrict it. And these generalized implications of finances or of prison accommodation fail to state why it is that only group prayer and only this kind of religious activity are being restricted while, say, football games and card games are permitted to happen in larger numbers. It's certainly reasonable prima facie to assume that the administrative overhead of restricting either one of them would be the same. So assuming that they do have these concerns, that the prison officials did have these concerns and that prompted the imposition of the policy, what exactly, what case would they look to to know that they were violating clearly established law in imposing the policy? Again, Your Honor, we would say that the Salahuddin v. Gord standard applies here, where there's no justification for a policy. It's not a question of difficult line drawing on the part of prison officials. And we submit that on this record where plaintiffs have alleged that any of the generalized interests invoked by defendants, there's no narrow tailoring here. The defendants could not reasonably believe that this policy of restricting prayer to groups of two in places where large group activities were routinely tolerated was reasonable, especially given that the nature of the prayer, as alleged by plaintiffs, was nondisruptive, peaceful. There was no history of security incidents at the prison that required the imposition, and other prisons accommodated exactly this sort of activity. So still it requires inference on their part about comparability of the policy. And Salahuddin was the joint prayer of Shiite and Sunni Muslims, right? So that was a different kind of policy and challenge. Yes, Your Honor, although defendants have not challenged the idea that group prayer and gathering for acts of physical worship is itself a protected religious activity. I don't think there's any confusion that the RFRA statute would apply to these facts, and therefore the nature of the interest in Salahuddin would certainly be something that they should be considering in adopting a policy restricting religious practices. And should they also, I mean, as Judge Walker pointed out, being the author of Salahuddin, I mean, that was a decision at summary judgment. Should that also bear on how prison officials look at what the established law is, that it was very fact-dependent? Yes, Your Honor. We believe that the summary judgment standard is relevant there. Again, Salahuddin was also under a free exercise standard, and given that the RFRA standard is, as this Court has noted, a fortiori, a higher bar than the free exercise clause in the prison context, we believe that certainly anything that violates the free exercise clause would also violate RFRA and that officials would be unnoticed of that. Thank you. I'd like to briefly address one other issue about the factual record here, which is that a holding for defendants that they were entitled to qualified immunity would effectively be saying that on this record defendants have justified the policy, and we would submit that plaintiff's allegations and the grievance responses themselves do not justify the policy. So when we ask that the Court reserve and that the district court be permitted to consider a qualified immunity argument on a full record, we're also saying that defendants require facts in order to prove up their justification for the policy, and without those facts a ruling on qualified immunity in this case would be premature. Responding briefly to a defendant's claim that the district court did not perform the relevant analysis, we would submit that this is not one of those cases where a remand is necessary. The district court considered the argument of qualified immunity. This isn't an omitted argument. It summarized the arguments of both plaintiffs and defendants, invoked Cutter v. Wilkinson and Salahuddin v. Gord in finding that there was a violation here, and we certainly think that that is a robust enough analysis at the motion-to-dismiss stage to— Wait. I've lost you. At the motion-to-dismiss stage, so don't we remand it in order to go on to the summary judgment stage? Yes, Your Honor. We understand defendants to be— I thought you said no remand. No, no, Your Honor. We would appreciate a remand. You just want a straight affirmance and then it would go back? Yes, Your Honor. We believe we should proceed to discovery at this stage and that defendants can renew their arguments for qualified immunity at the summary judgment stage rather than ordering the district court to issue another order on the motion-to-dismiss stage, which would be a waste of judicial resources and duplicative of the reasoning in the district court opinion, which is certainly adequate for purposes of this case. Very good. Thank you. I think we have the argument. Thank you, Your Honors. Thank you. Mr. Winnick, you have reserved three minutes of rebuttal. Thank you, Your Honor. Three quick points. First, Mr. Carlin said a qualified immunity reversal here would mean that we have not justified policy. That's not what it means at all. What it would mean is that the policy wasn't clearly unjustified. That is the relevant question on qualified immunity, not whether it was justified, whether it was clearly unjustified. Qualified immunity is properly granted unless every reasonable official in the position of the defendants would have understood that what he or she is doing is unlawful. What would it mean, though, as to the narrow tailoring obligation of the government and the higher standard imposed by RFRA if at this stage where there are these allegations about other activity that was permitted that is similar and that did not have the religious component? I'm troubled by leaving that stand. So, Your Honor, RFRA does not insist on equal treatment of all religious and all secular activities. What is relevant is whether there is disparate treatment of comparable activities. That's a relevant question, whether they are comparable. Well, doesn't that – I mean, here we have congregate prayer versus congregate ping-pong. I mean, there's limited numbers. Isn't that comparable from a security perspective, that being the main justification offered in the grievance responses? I don't think that's at all clear, Your Honor. And unless it is clearly established that they are comparable, unless it is clearly established that this is not the least restrictive means of advancing a compelling government interest, then qualified immunity is proper. That is, again, what Red v. Wright and Hall v. Eckfey says. It has to be clearly established that this isn't the least restrictive means of advancing a compelling government interest. And to put that in sort of real-world and non-legalistic terms, the relevant question is if you're the wardens here, is it completely obvious from case law that you have to treat group prayer with precisely the same restrictions as ping-pong? And in the context of prison management, which is an incredibly difficult enterprise in the course of which managing religious practice is among the most complex parts, I don't think that was completely obvious, and that's why qualified immunity was proper here. At the motion-to-dismiss stage, even. Yes, and on that point, Your Honor, what this Court said in Garcia v. Doe bears emphasis. Because qualified immunity protects officials not merely from liability but from litigation, qualified immunity not only can be resolved but should be resolved on a motion to dismiss where possible to avoid subjecting officials to time-consuming and expensive discovery. Obviously, the allegations have to be taken as true, but this is not a rubber stamp. If the allegations taken as true do not plausibly establish a violation of clearly established law, qualified immunity should be granted on a motion to dismiss, and it should appear with respect to the District Court's contrary ruling be reversed. Thank you very much. Thank you both for your arguments. We will reserve decision. Thank you. Thank you.